David Albert Pierce, Esq. SBN 162396
david@piercellp.com
John R. Baldivia, Esq. SBN 313699
john@piercellp.com
**PIERCE LAW GROUP LLP**
9100 Wilshire Boulevard
Suite 225 East Tower
Beverly Hills, California 90212-3415
Telephone (310) 274-9191
Facsimile (310) 274-9151

Attorneys for Defendant and Counter-Claimant JESSICA CESARO, professionally known as "JESSICA HAID"

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| ROBIN BAIN, an Individual,<br><br>Plaintiff,<br><br>v.<br><br>FILM INDEPENDENT, INC., a California Corporation, doing business as the "LA Film Festival"; LA MEDIA WORKS, CORP. a business entity of unknown form; JESSICA HAID a.k.a. "Jessica Cesaro", an Individual; and DOES 1-10,<br><br>Defendants. | Case No.: 2:18-cv-04126-PA(JEMx)<br><br>**DEFENDANT / COUNTER-CLAIMANT JESSICA HAID'S MOTION FOR SUMMARY JUDGMENT AND/OR ADJUDICATION**<br><br>DATE:         August 10, 2020<br>TIME:         1:30 p.m.<br>JUDGE:      Percy Anderson<br>COURTROOM: 9A |
| JESSICA CESARO professionally known as "JESSICA HAID," an Individual,<br><br>Counter-Claimant,<br><br>v.<br><br>ROBIN BAIN, an Individual; and DOES 11-20,<br><br>Counterclaim-Defendants. | COMPLAINT FILED:<br>   May 16, 2018<br>FINAL PRETRIAL CONFERENCE:<br>   October 8, 2020<br>TRIAL DATE:<br>   October 13, 2020 |

**PIERCE LAW GROUP LLP**
9100 Wilshire Boulevard
Suite 225 East Tower
Beverly Hills, California 90212

---

**DEFENDANT / COUNTER-CLAIMANT JESSICA HAID'S MOTION FOR SUMMARY JUDGMENT AND/OR ADJUDICATION**

-1-

**PIERCE LAW GROUP LLP**
9100 Wilshire Boulevard
Suite 225 East Tower
Beverly Hills, California 90212

# <u>TABLE OF CONTENTS</u>

I.    **<u>INTRODUCTION</u>** ....................................................................................1

II.   **<u>STATEMENT OF FACTS</u>** ..............................................................2

     *Haid's Employment by Bain for* **Nowhereland** ...................................2

     *Creation of Haid's Acting Reel* ............................................................3

     *Legal Action from Bain* .........................................................................5

     *Comparison of the Film to the Two Reels* ............................................6

III.  **<u>LEGAL STANDARD</u>** .......................................................................8

IV.   **<u>ARGUMENT</u>** .....................................................................................9

     a.  **Haid's Commissioning of an Acting Reel is Protected by Fair Use** ........................................................................................9

          i.    *<u>Purpose and Character of the Use</u>* ..........................................10

          ii.   *<u>Nature of the Copyrighted Work</u>* ...........................................12

          iii.  *<u>Amount and Substantiality of the Portion Used</u>* ....................12

          iv.   *<u>Effect of the Use Upon the Potential Market</u>* ..........................14

     b.  **Bain Cannot Prove The Necessary Elements of Her Claim for Violation of the Digital Millennium Copyright Act (17 U.S.C. § 1202)** ..................................................................................................16

          i.    *<u>Haid Did Not Remove any Copyright Management Information</u>* .................................................................................17

          ii.   *<u>Haid Had No Knowledge That the Removal of Copyright Management Information would "Induce, Enable, Facilitate, or Conceal" Infringement</u>* .............................................................17

          iii.  *<u>Haid's Hiring of LA Media to Create the Reel Does not Infringe on Bain's Rights Because Her Actions Pertaining to the Reel are Protected by Fair Use</u>* ......................................................17

V.    **<u>CONCLUSION</u>** ...............................................................................18

PIERCE LAW GROUP LLP
9100 Wilshire Boulevard
Suite 225 East Tower
Beverly Hills, California 90212

# <u>TABLE OF AUTHORITIES</u>

## <u>Cases</u>

*Brown v. Netflix, Inc.*,
 No. 19 CIV. 1507 (ER), 2020 WL 2749571 (S.D.N.Y. May 27, 2020) ....... 13

*Campbell v. Acuff–Rose Music, Inc.*,
 510 U.S. 569 (1994) .............................................................. 9, 10, 12, 13, 14

*Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*,
 109 F.3d 1394 (9th Cir. 1997) ............................................................... 12

*Fisher v. Dees*,
 794 F.2d 432 (9th Cir. 1986) ................................................................... 9

*Harper & Row, Publishers, Inc. v. Nation Enterprises*,
 471 U.S. 539 (1985) .............................................................. 9, 12, 13, 15

*Kelly v. Arriba Soft Corp.*,
 336 F.3d 811 (9th Cir. 2003) ................................................................. 13

*Seltzer v. Green Day, Inc.*,
 725 F.3d 1170 (9th Cir. 2013) ............................................................... 13

*Stevens v. Corelogic, Inc.*,
 899 F.3d 666 (9th Cir. 2018), cert. denied, 139 S. Ct. 1222 (2019) ............. 16

*Worldwide Church of God v. Philadelphia Church of God, Inc.*,
 227 F.3d 1110 (9th Cir. 2000) ............................................................... 12

## <u>Statutes</u>

17 U.S.C. § 107 ............................................................................... 9, 10, 17

17 U.S.C. § 107(1) ................................................................................... 10

17 U.S.C. § 107(2) ................................................................................... 12

17 U.S.C. § 107(3) ................................................................................... 12

17 U.S.C. § 107(4) ................................................................................... 14

17 U.S.C. § 1202 ...................................................................................... 16, 18

17 U.S.C. § 1202(b)(1) ................................................................................. 16

17 U.S.C. § 1202(b)(3) ................................................................................. 16

**Secondary Materials**

Nimmer § 13.05[A] [4] ................................................................................. 15

PIERCE LAW GROUP LLP
9100 Wilshire Boulevard
Suite 225 East Tower
Beverly Hills, California 90212

PIERCE LAW GROUP LLP
9100 Wilshire Boulevard
Suite 225 East Tower
Beverly Hills, California 90212

## MEMORANDUM OF POINTS AND AUTHORITIES

Defendant Jessica Cesaro, professionally known as Jessica Haid ("Haid"), by and through her counsel, hereby submits this Memorandum of Points and Authorities in support of her Motion for Summary Judgment and/or Adjudication.

## I.   INTRODUCTION

This case is about a former Playboy model turned film writer/director/producer, Robin Bain ("Bain"), who in the process of making movies that shed light on the victimization of women, has herself victimized her lead actress, Haid, culminating in filing this copyright lawsuit against Haid for simply commissioning the creation of an acting reel. Bain took advantage of a poor girl who was new to Hollywood and film making, and caused her to endure questionable safety practices on set, for pay that was below minimum wage, all while beguiling her with the prospect of an illustrious acting reel that all budding actors try so desperately to build when they are first starting their careers.

Through a series of false promises, Bain takes advantage of Haid's naivete and subjects her to extreme working conditions for little pay. Ultimately, *Bain* gets to make the movie *Bain's* way. The film immediately garners wide festival success in the United States. Unfortunately for Haid, despite being the lead of the film, Haid never capitalizes on the film's success because Bain never followed through with her promise to provide Haid with footage for a reel.

Once a copy of the film found its way into Haid's hands, she immediately hired a reel editor to help her create an acting reel so that she could finally seek more work. As one would expect, it is industry custom and practice for actresses to use footage of their prior work in their acting reels. Even Bain does it. In this instance, however, there can only be one star of the show. When Bain learns about the reel, Bain immediately demands Haid to destroy it before Haid ever puts it to

---

**DEFENDANT / COUNTER-CLAIMANT JESSICA HAID'S MOTION FOR SUMMARY JUDGMENT AND/OR ADJUDICATION**

1    use.  Yet, even after Haid destroys all copies of the reel in her possession, Bain

2    wanted to teach Haid a lesson – this is *Bain's* movie and *she's* the star.

3

4    **II.    STATEMENT OF FACTS**

5    ***Haid's Employment by Bain for* Nowhereland**

6    Haid was employed by Plaintiff Robin Bain ("Bain") in 2014 and cast as the

7    lead character, "Shara," in the motion picture *Girl Lost*, also known as *Nowhereland*

8    ("Film").  Statement of Uncontroverted Facts ("SUF") ¶ 1. Haid first commenced

9    work for Bain in 2014 for the purpose of creating a "sizzle reel" to raise financing

10   for the production of the Film, and was thereafter employed for production by Bain

11   and her production company, Nowhereland Movie LLC. *Id.* ¶ 2. After several

12   months for pre-production, principal photography for the Film commenced on or

13   about November 3, 2014, and Haid continued to work for Bain through principal

14   photography, post-production, and during the festival circuit.  *Id.* ¶ 3. During

15   production, Bain made promises that Haid would be able to use footage from the

16   Film in her acting reel (i.e. a collection of scenes designed to show an actor's range

17   of emotions, versatility, and level of acting prowess). *Id.* ¶ 4. A finished version of

18   the Film was completed on or about late-2015 / early-2016.  *Id.* ¶ 5.

19   The Film was commercially exhibited at numerous film festivals throughout

20   the United States. *Id.* ¶ 6. In 2016 alone, the Film was exhibited at no less than the

21   following festivals:

22   - May 26, 2016 at the IFS Film Festival in Los Angeles, California;

23   - October 21, 2016 at the LA Femme Film Festival in Beverly Hills,
24     California;

25   - October 25, 2016 at the Twin Cities Film Festival in Minneapolis,
26     Minnesota;

27   - November 6, 2016 at the ARPA International Film Festival in
28     Hollywood, California;

PIERCE LAW GROUP LLP
9100 Wilshire Boulevard
Suite 225 East Tower
Beverly Hills, California 90212

- November 23, 2016 at the Newfilmmakers New York in New York City, New York.

*Id.*

The Film continued to garner critical acclaim, garnering numerous awards from the various festivals in 2016 and 2017.  *Id.* ¶ 7. In May of 2018, the Film became available for streaming to the public, and quickly became the "#1 Trending Movie on AMAZON PRIME VIDEO in June 2018," the "#1 Most Popular Movie on TubiTV.com in June & July 2018," the "Top 5 Trending Movie on Apple TV in June 2018," and "Over 2.7 MILLION VIEWS of the Official Girl Lost Trailer on YouTube," and "Project of the day on IndieWire." *Id.* ¶ 8. As a result of the Film's success, Bain commenced production for a sequel to the Film, which is a continuation of the same theme.  *Id.* ¶ 9. Promotional artwork for the sequel, *Girl Lost 2: A Hollywood Story*, reads as follows:

"80% of runaway & homeless girls report having been involved in prostitution"[1]

*Id.*

### Creation of Haid's Acting Reel

As the Film continued to receive festival success, Haid requested that Bain provide her with footage from some of the scenes in the Film so that Haid could create an acting reel in order to obtain more work as an actress.  *Id.* ¶ 10. Bain declined to provide footage so that a reel could be created, despite previously promising to Haid during principal photograph that footage from the Film would be made available to her for her acting reel. *Id.* ¶ 11.

---

[1] The marketing image for *Girl Lost 2: A Hollywood Story* is publicly available on the website https://www.girllostmovie.com/. SUF ¶ 70.

PIERCE LAW GROUP LLP
9100 Wilshire Boulevard
Suite 225 East Tower
Beverly Hills, California 90212

In early 2017, Haid received a digital copy of the Film from another individual. *Id.* ¶ 12. Haid has no knowledge of how the individual obtained a digital copy of the Film or how the individual may have had access to a copy. *Id.* ¶ 13. The copy that Haid received contained copyright management information ("CMI"). *Id.* ¶ 14. The words "Property of LesLin Films 2016" were present at the bottom of the screen. *Id.*

In early 2017, Haid contacted Marc D'Amour ("D'Amour") of LA Media Works, Corp. ("LA Media") to commission the creation of an acting reel ("Reel"). *Id.* ¶ 15. As source material, Haid provided D'Amour with the digital copy of the Film that was in her possession, along with additional source material that was in her possession. *Id.* ¶ 16.

Using the source material that was provided by Haid, D'Amour created his first pass of the Reel. *Id.* ¶ 17. As part of D'Amour's routine process, D'Amour removed the CMI while preparing the Reel so that it does not distract prospective viewers. *Id.* ¶ 18. Haid never instructed D'Amour to do so. *Id.* ¶ 19. The only footage that D'Amour chose to use for the Reel was footage from the Film, even though Haid provided D'Amour with other sources. *Id.* ¶ 20. The other footage was not used because they consisted of low production quality videos. *Id.* ¶ 21. D'Amour and his assistant identified all of the scenes that would be used in creating the Reel without Haid's input as to what scenes should be included in the Reel. *Id.* ¶ 22. D'Amour alone chose the start and end point for each of the clips, using his own software, on his own computer. *Id.* ¶ 23.

On February 27, 2017, D'Amour uploaded the first pass of the Reel to his account on Vimeo.com, which then allowed him to post the video onto a page on LA Media's Wordpress website. *Id.* ¶ 24. By uploading the video in this manner, Haid was able to view D'Amour's first pass of the Reel through her web browser without having to download a copy of the video to her computer. *Id.* ¶ 25. D'Amour delivered an email to Haid on February 28, 2017 which contained the url link

**DEFENDANT / COUNTER-CLAIMANT JESSICA HAID'S MOTION FOR SUMMARY JUDGMENT AND/OR ADJUDICATION**

-4-

http://lamediaworks.com/jessica-taylor-haid/, in order for Haid to view D'Amour's first pass of the Reel. *Id.* ¶ 26. Although D'Amour only intended to share the Reel with Haid, neither D'Amour nor Haid were aware at the time that the url was publicly available or searchable on the Google search engine. *Id.* ¶ 27.

On March 8, 2017, Haid asked D'Amour to make minor changes by adding and removing some scenes that were in the Film, without specifying how much of any particular scene to add. *Id.* ¶ 28. On March 21, 2017, D'Amour sent another pass of the Reel to Haid, using the same url. *Id.* ¶ 29. Haid responded the same day, asking D'Amour to add "a little more from the bedroom scene," and "take out the kiss at 1:10 and full body shot at 2:05." *Id.* ¶ 30. On March 23, 2017, D'Amour created what would become the final draft of the Reel, again using the same url to make the Reel available to Haid. *Id.* ¶ 31. Haid responded on March 31, 2017, thanking him for his hard work and stating "It's perfect. I'm so happy!" *Id.* ¶ 32. D'Amour sent an invoice to Haid in the amount of $405, which was then paid on May 10, 2017. *Id.* ¶ 33. Haid had no affiliation with LA Media thereafter. *Id.* ¶ 34.

### *Legal Action from Bain*

Even though Haid commissioned D'Amour to create the Reel in hopes to find more work as an actress, Haid never utilized the Reel and did not earn a single dollar from the creation or distribution of her Reel. *Id.* ¶ 35. Haid never obtained a role as an actress through the use of her Reel. *Id.* Haid did not share the Reel with any film producers or casting agents. *Id.* Haid never sold her Reel for profit, nor did she make the Reel available for public consumption. *Id.*

Bain discovered the Reel on LA Media's website on or about August 10, 2017. *Id.* ¶ 36. Bain then contacted LA Media and requested that the Reel be taken down. *Id.* ¶ 37. The Reel was removed from LA Media's website on or about August 10, 2017. *Id.* Counsel for Bain then delivered a cease and desist letter to Haid via email on August 23, 2017, instructing Haid to destroy all copies of the Film and the

Reel that were in her possession. *Id.* ¶ 38. Shortly thereafter, Haid fully complied and destroyed all copies of the Film and the Reel, as well as any correspondence between her and D'Amour, in regard to her good faith understanding of what was required of her to comply with the cease and desist letter from Bain's counsel. *Id.* ¶ 39. On August 31, 2017, Haid responded to Bain's counsel via email, stating in part, "Here you have in writing that I Jessica do not posses [sic] any copies of Nowhereland." *Id.* ¶ 40.

On January 16, 2018, Bain's new counsel sent a follow up demand letter to Haid, five months after Haid previously confirmed that she had destroyed all copies of the Film and the Reel. *Id.* ¶ 41. By May of 2018, Bain filed this instant lawsuit against Haid for: (1) Copyright Infringement; (2) Vicarious and/or Contributory Copyright Infringement; (3) violation of the Digital Millennium Copyright Act (17 U.S.C. § 1202); and (4) Conversion.[2] Dkt. 1 Complaint. This lawsuit garnered immediate press attention in *The Hollywood Reporter*. *Id.* ¶ 44. Although the Reel was inadvertently made public by LA Media, throughout the duration of this lawsuit, Bain has been unable to produce a single piece of evidence which would demonstrate that the Reel had any real or potential effect on the market for the Film. *Id.* ¶ 45. As of August 31, 2017, Haid's Reel had a total view count of three views on Vimeo.com. *Id.* ¶ 46.

### Comparison of the Film to the Two Reels

The Film has a total run-time of 95 minutes. *Id.* ¶ 47. The copyright for the Film was registered by Bain with an effective date of August 11, 2017, five months after the Reel was created. *Id.* ¶ 48. The Film was made publicly available on

---

[2] Bain's claim for conversion was dismissed with prejudice on a Motion to Dismiss.  Dkt. 25 Minute Order.

PIERCE LAW GROUP LLP
9100 Wilshire Boulevard
Suite 225 East Tower
Beverly Hills, California 90212

Amazon Prime in or about May of 2018. *Id.* ¶ 49. The description on Amazon Prime reads as follows:

> Growing up in the seedy, underbelly of Los Angeles, Shara knows no other life.  After a dramatic encounter with her mom's abusive ex-boyfriend, Shara finds herself homeless and alone on the streets of Hollywood.  Struggling to survive, the wayward teen turns to the only option she believes she has, selling her body and her soul.

*Id.* ¶ 50.

As is common in American film, the story of the Film is built on a structure composed of three acts, which tells the story of Shara and her life as a prostitute at a young age, and the characters that shape her experience with sex-trafficking. *Id.* ¶ 51.

The Reel, in contrast, does very little to tell the actual story of the Film, if at all. *Id.* ¶ 52. The Reel consists entirely of clips that demonstrate Haid's range of emotion, versatility, and level of acting prowess as an actress. *Id.* ¶ 53. One hundred percent of the Reel depicts Haid in the role of Shara since the Film is the only source that was actually used by D'Amour to create the Reel. *Id.* ¶ 54.

The version of the Reel that was made viewable to Haid on February 28, 2017 has a run time of 2 minutes and 50 seconds. *Id.* ¶ 55. The Reel, as is customary, focused entirely on Haid, and only depicts six other characters from the Film, none of which appear in the Reel for more than 19 seconds out of 2 minutes and 50 seconds. *Id.* ¶ 56. Other characters from the Film who play critical roles in the storyline never appear in the Reel. *Id.* ¶ 57. The clips do not portray any of the main plot points or story arcs that were present in the Film.  *Id.* ¶ 58. This version consists of 40 different segments, or clips, from the Film, which average about 2.8 seconds in length for each clip. *Id.* ¶ 59. The various clips were arranged out of sequence in

PIERCE LAW GROUP LLP
9100 Wilshire Boulevard
Suite 225 East Tower
Beverly Hills, California 90212

PIERCE LAW GROUP LLP
9100 Wilshire Boulevard
Suite 225 East Tower
Beverly Hills, California 90212

1  comparison to the scenes as they appear in the Film. *Id.* ¶ 60. The clips were also

2  synchronized to music that was otherwise not present in the Film itself. *Id.* ¶ 61.

3      The version of the Reel that was made viewable to Haid on March 23, 2017

4  has a run time of 3 minutes and 39 seconds. *Id.* ¶ 62. This version is very similar to

5  the prior version, and again depicts the same six characters from the Film and no

6  one else, with the primary focus on Haid's character for the entirety of the Reel. *Id.*

7  ¶ 63. The clips again did not portray any of the main plot points or story arcs that

8  were present in the Film. *Id.* ¶ 64. This version again consists of 40 different clips

9  from the Film, which average about 3.6 seconds in length for each clip. *Id.* ¶ 65.

10 While there is a motel scene that exceeds 1 minute in length, this particular clip

11 eliminates most of the dialogue of the character playing opposite of Haid, and

12 focuses solely on the expressiveness of Haid's emotions to demonstrate her ability

13 to carry such an emotional scene, in keeping with the purpose of an acting reel. *Id.*

14 ¶ 66. The clips in this version are again out of sequence in comparison to the scenes

15 as they appear in the Film, and synchronized to the same music as the prior version

16 which did not originate from the Film. *Id.* ¶ 67.

17

18 ### III.    **LEGAL STANDARD**

19     Summary judgment is proper "if the pleadings, depositions, answers to

20 interrogatories, and admissions on file, together with the affidavits, if any, show

21 that there is no genuine issue as to any material fact and that the moving party is

22 entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317,

23 322–23 (1986); Fed. R. Civ. Proc. Rule 56(c). Entry of summary judgment is

24 mandated when a party is unable to make a showing sufficient to establish the

25 existence of an element essential to that party's case, and on which that party will

26 bear the burden of proof at trial.  *Celotex*, 477 U.S. at 322–23.  There can be "no

27 genuine issue as to any material fact," since a complete failure to prove an essential

28 element of the nonmoving party's case renders all other facts immaterial. *Id.*  In such

instance, the moving party is "entitled to a judgment as a matter of law" because the nonmoving party fails to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof. *Id.*

## IV.   <u>ARGUMENT</u>

### a.  Haid's Commissioning of an Acting Reel is Protected by Fair Use

Bain's claims for Copyright Infringement, Vicarious and/or Contributory Copyright Infringement, and Violation of the Digital Millennium Copyright Act (17 U.S.C. § 1202) must fail because the allegedly infringing works are protected by fair use.

The doctrine of fair use creates a limited privilege in those other than the owner of a copyright to use the copyrighted material in a reasonable manner without the owner's consent. *Fisher v. Dees*, 794 F.2d 432, 435 (9th Cir. 1986) (citing *Harper & Row, Publishers, Inc. v. Nation Enterprises*, 471 U.S. 539 (1985)).  Fair use is regarded as an equitable defense to copyright infringement.  *Fisher*, 794 F.2d at 435.  The doctrine of fair use is codified in 17 U.S.C. §107, which states that if a secondary user of a copyrighted work is fair then the secondary user may bypass the exclusive rights of the owner.  However, Congress expressly sought to preserve the doctrine's common law character, leaving courts "free to adapt the doctrine to particular situations on a case-by-case basis." *Campbell v. Acuff–Rose Music, Inc.*, 510 U.S. 569, 577 (1994), citing17 U.S.C. § 107; *Fisher*, 794 F.2d at 435.  "In determining whether the use made of a work in any particular case is a fair use the factors to be considered shall include—

(1) the purpose and character of the use, including whether such use is
of a commercial nature or is for nonprofit educational purposes;
(2) the nature of the copyrighted work;

PIERCE LAW GROUP LLP
9100 Wilshire Boulevard
Suite 225 East Tower
Beverly Hills, California 90212

---

**DEFENDANT / COUNTER-CLAIMANT JESSICA HAID'S MOTION FOR SUMMARY JUDGMENT AND/OR ADJUDICATION**

PIERCE LAW GROUP LLP
9100 Wilshire Boulevard
Suite 225 East Tower
Beverly Hills, California 90212

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use upon the potential market for or value of the copyrighted work.

The fact that a work is unpublished shall not itself bar a finding of fair use if such finding is made upon consideration of all the above factors." *Campbell*, 510 U.S. at 576–77, *citing* 17 U.S.C. § 107.

### *i. Purpose and Character of the Use*

The first factor in a fair use inquiry is "the purpose and character of the use." 17 U.S.C. § 107(1); *Campbell*, 510 U.S. at 578–79. The central purpose of this investigation is to see whether the new work merely "supersede[s] the objects" of the original creation, or instead adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message; it asks, in other words, whether and to what extent the new work is "transformative." 510 U.S. at 579. Transformative works "lie at the heart of the fair use doctrine's guarantee of breathing space within the confines of copyright . . . and the more transformative the new work, the less will be the significance of other factors . . . that may weigh against a finding of fair use." *Id.* at 579.

The sole purpose of the Reel, and any acting reel for that matter, is to provide prospective employers with a sense of the actress's level of acting talent before the employer decide to audition or cast the actress in future acting roles. The Reel can best be understood as Haid's acting resume. The Reel is supposed to convey the range of emotion that Haid is able to demonstrate as an actress. Regardless of whether the Reel consists of footage from one source, or many sources, the ultimate purpose is not to capture a wide variety of work, but rather a wide variety of expression and emotion to convey the range of Haid's talent. For a particularly new actress, such as Haid, is it not unusual to pull all of the footage from the most

professionally produced source that she has available.  This is because the quality of the footage, whether fairly or unfairly, may have some effect on the viewer's perception of Haid's abilities as an actress.  If Haid only has one project that can properly convey her acting ability, then pulling from alternative performances that are subpar or low quality would only serve to make her Reel less dynamic, less convincing, and less effective.

Furthermore, the Reel makes absolutely no attempt to tell the story of the Film.  The Reel does not tell the story of Shara's (Haid's character) involvement with depression, sex-trafficking, drug abuse, sexual assault, poverty, or suicide. This is because the underlying story of the scene is not pertinent to whether Haid is qualified for a role in another film.  When a prospective employer is reviewing Haid's work, the employer is not trying to understand the storyline of the role that she is presenting.

Thus, this Reel does not capture the story of the Film at all.  In fact, it portrays the scenes of the Film out of sequence, omits important plot points, and intentionally does not include the entirety of the scenes that they were pulled from.  For example, in almost every clip that was used in the Reel, the dialogue for the character playing opposite of Haid is omitted, except when necessary to provide context for what Haid's character is saying in the scene.  The Reel does portray some of the characters that are central to the story (Kim, Jamie, Bridgette, Louie, Cap), but also fails to include other characters that are significant to the story (Madame Yeva, the customers that Shara meets along the way).

Because the purpose of the Reel is solely to provide a prospective employer with a sense of Haid's acting ability, and serves absolutely no purpose of telling the story of the underlying work from which the scenes are sourced from, the purpose of the Reel is transformative in nature when compared to the purpose of the Film. This factor therefore weighs in favor of a finding of fair use.

PIERCE LAW GROUP LLP
9100 Wilshire Boulevard
Suite 225 East Tower
Beverly Hills, California 90212

---

**DEFENDANT / COUNTER-CLAIMANT JESSICA HAID'S MOTION FOR SUMMARY JUDGMENT AND/OR ADJUDICATION**

-11-

*ii.   Nature of the Copyrighted Work*

The second statutory factor, "the nature of the copyrighted work," draws on the expression, the "value of the materials used."  17 U.S.C. § 107(2); *Campbell*, 510 U.S. at 586. Some works are closer to the core of intended copyright protection than others, with the consequence that fair use is more difficult to establish when the former works are copied.  *Id*.  This factor "turns on whether the work is informational or creative." *Worldwide Church of God v. Philadelphia Church of God, Inc.*, 227 F.3d 1110, 1118 (9th Cir. 2000); see also *Harper & Row*, 471 U.S. at 563 ("The law generally recognizes a greater need to disseminate factual works than works of fiction or fantasy.").  The Ninth Circuit has recognized, however, that this second factor "typically has not been terribly significant in the overall fair use balancing." *Dr. Seuss Enters., L.P. v. Penguin Books USA, Inc.*, 109 F.3d 1394, 1402 (9th Cir. 1997).

Here, both the Film and the Reel are in audio-visual format.  This is because an acting reel is supposed to be a compilation of scenes that are taken from other motion picture projects that the actor or actress has previously appeared in.  An acting reel would not serve its purpose properly if it were not in the same audio-visual format as the work from which the footage has been sourced.  Therefore, this factor is of no help in "separating the fair use sheep from the infringing goats" when trying to determine whether an acting reel infringes on the copyright of the original motion picture that a scene is sourced from.  See *Campbell*, 510 U.S. at 586.

While this factor is not that important, it should be noted that, while the Film's primary purpose is to convey a fictional story, the Reel's primary purpose is to convey *factual* information about Haid's acting ability and the quality of her performance.

*iii.   Amount and Substantiality of the Portion Used*

The third factor asks whether "the amount and substantiality of the portion used in relation to the copyrighted work as a whole," or whether "the quantity and

PIERCE LAW GROUP LLP
9100 Wilshire Boulevard
Suite 225 East Tower
Beverly Hills, California 90212

value of the materials used" are reasonable in relation to the purpose of the copying. 17 U.S.C. § 107(3); *Campbell*, 510 U.S. at 586–87. The extent of permissible copying varies with the purpose and character of the use. *Id*. The facts bearing on this factor will also tend to address the fourth, by revealing the degree to which the new work may serve as a market substitute for the original or potentially licensed derivatives. *Id*. A taking may not be excused merely because it is insubstantial with respect to the infringing work, for example, when the infringing work takes what is essentially the "heart" of the original work. See *Harper & Row*, 471 U.S. at 565.

The Supreme Court has recognized, however, that this factor necessarily overlaps somewhat with the first factor—the "extent of permissible copying varies with the purpose and character of the use." *Campbell,* 510 U.S. at 586–87. See also *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1178 (9th Cir. 2013). This factor will not weigh against an alleged infringer, even when he or she copies the whole work, if he or she takes no more than is necessary for his or her intended use. See *Seltzer*, 725 F.3d at 1178 (Green Day's transformative use of the *Scream Icon* image was fair use, even though the image was used in its entirety); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811, 820–21 (9th Cir. 2003) ("If the secondary user only copies as much as is necessary for his or her intended use, then this factor will not weigh against him or her."). Thus, taking the "heart" of the original work is not dispositive when the subsequent work is transformative in nature. See e.g. *Brown v. Netflix, Inc.*, No. 19 CIV. 1507 (ER), 2020 WL 2749571, at *5 (S.D.N.Y. May 27, 2020) (repeat and substantial use of the song "*Fish Sticks N' Tater Tots*," which was written for children, within in the context of a documentary about burlesque dancers, which was targeted to adults, was found to be fair use).

Here, the Reel does not capture the essence or the "heart" of the underlying Film. The Film is structured in three acts, which ultimately tells the story of Shara (Haid's character) and her experience in the world of sex-trafficking. Critical

PIERCE LAW GROUP LLP

9100 Wilshire Boulevard
Suite 225 East Tower
Beverly Hills, California 90212

PIERCE LAW GROUP LLP
9100 Wilshire Boulevard
Suite 225 East Tower
Beverly Hills, California 90212

elements of the story include Shara's relationship with her mother Kim, her boyfriend Jamie, and the many individuals that take advantage of her body along the way (Cap, Louie, Madame Yeva, and others).

The Reel captures none of that. The Reel itself is not broken into Act I, Act II, or Act III. The Reel omits most of the critical plot points that drive the story from beginning to end. As previously stated, the purpose of each scene in the Reel is to demonstrate Haid's ability to portray a range of emotion within each scene. In the first version of the Reel, the average length of the scene is 2.8 seconds. In the second version of the Reel, the average length of the scene is 3.6 seconds. It would be virtually impossible to capture the "heart" of the Film by watching it out of order, 2 to 3 seconds at a time, with many of the central characters omitted. Even in the motel scene which is 1 minute and 9 seconds in length in the second Reel, almost the entire scene is focused on the character Shara with very little dialogue from the character opposite of her. To the extent that any footage incorporated in the Reel contains any critical moments of the Film, whether by revealing that Shara is a prostitute, or Shara having a long emotional scene with her boyfriend in a motel room, or capturing a glimpse of Shara in a bath tub before she cuts herself, the Reel captures only the amount necessary to accomplish its transformative purpose, that is, exhibiting the dynamic range of Haid's acting ability.

This factor weighs in favor of a finding of fair use.

### iv.   *Effect of the Use Upon the Potential Market*

The fourth fair use factor is "the effect of the use upon the potential market for or value of the copyrighted work." 17 U.S.C. § 107(4); *Campbell*, 510 U.S. at 590. It requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also "whether unrestricted and widespread conduct of the sort engaged in by the defendant ... would result in a substantially adverse impact on the potential market" for the original. *Id.* (*citing*

Nimmer § 13.05[A] [4], p. 13–102.61 (footnote omitted)); accord, *Harper & Row*, 471 U.S. at 569. The inquiry "must take account not only of harm to the original but also of harm to the market for derivative works." *Id.* at 568.

In this case, there is no evidence that the Reel had any effect on the market for the Film. Haid did not earn a single dollar from the creation or distribution of her Reel. Haid never obtained a role as an actress through the use of her Reel. Haid did not share the Reel with any film producers or casting agents. Haid never sold her Reel for profit, nor did she make the Reel available for public consumption. The Reel garnered a total of **three** views on the Vimeo website, and the three views do not translate to any revenue to Haid whatsoever.

As for any potential market effect, there is no potential market for Haid's Reel whatsoever. The sole purpose of the Reel is to present to potential employers a range of Haid's acting ability so that they may consider her for future acting roles. The Reel itself is not intended for profit, nor is there an audience for people to purchase Haid's Reel, as charging for access to the Reel would impede Haid's ability to procure further work as an actress. Despite the fact that the Reel was inadvertently available to the public on LA Media's website, no evidence exists that the Reel affected Bain's ability to secure distribution. **The Film became an immediate success in just one month after its wide release on several online video platforms.** As a result of the Film's success, Bain has even commenced production on a subsequent film entitled *Girl Lost: A Hollywood Story*. The public attention that this lawsuit received on *The Hollywood Reporter* arguably garnered more attention that the Reel itself. Assuming *arguendo*, to the effect that the Reel may have in any manner affected the potential market by way of any negative publicity from the lawsuit, this kind market harm is solely the result of Bain's actions.

PIERCE LAW GROUP LLP
9100 Wilshire Boulevard
Suite 225 East Tower
Beverly Hills, California 90212

---

**DEFENDANT / COUNTER-CLAIMANT JESSICA HAID'S MOTION FOR SUMMARY JUDGMENT AND/OR ADJUDICATION**

Because the Reel has no effect on any real or potential market for the Film, or any subsequent projects for Bain, this factor weighs heavily in favor of a finding of fair use.

### b. Bain Cannot Prove The Necessary Elements of Her Claim for Violation of the Digital Millennium Copyright Act (17 U.S.C. § 1202)

Bain's claim for Violation of the Digital Millennium Copyright Act (17 U.S.C. § 1202) against Haid must fail because Bain cannot prove that Haid possessed the requisite mental state under the law.  Section 1202(b)(1) provides:

> "No person shall, without the authority of the copyright owner or the law ... intentionally remove or alter any copyright management information ... **knowing, or** ... **having reasonable grounds to know**, that it will induce, enable, facilitate, or conceal an infringement of any [copyright]."

17 U.S.C. § 1202(b)(1). See *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 673 (9th Cir. 2018), cert. denied, 139 S. Ct. 1222 (2019).  Section 1202(b)(3) provides:

> "No person shall, without the authority of the copyright owner or the law ... distribute, import for distribution, or publicly perform works, copies of works, or phonorecords, knowing that copyright management information has been removed or altered without authority of the copyright owner or the law, **knowing, or** ... **having reasonable grounds to know**, that it will induce, enable, facilitate, or conceal an infringement of any [copyright]."

17 U.S.C. § 1202(b)(3); *Stevens*, 899 F.3d at 673.  Both provisions therefore require Haid to possess the mental state of knowing, or having a reasonable basis to know, that her actions "will induce, enable, facilitate, or conceal" infringement of the Film. *Id.*

PIERCE LAW GROUP LLP
9100 Wilshire Boulevard
Suite 225 East Tower
Beverly Hills, California 90212

*i.  <u>Haid Did Not Remove any Copyright Management Information</u>*

It is undisputed that Haid played no role in removing any CMI from the Film. Moreover, it goes against her interests to hide the fact that the footage in her Reel was taken from a professionally produced motion picture for which she was paid. The removal of CMI was performed as a routine process of LA Media in preparing footage for the Reel.  At no point did Haid instruct D'Amour to remove information from the Film prior to incorporating scenes in the Reel.

*ii.  <u>Haid Had No Knowledge That the Removal of Copyright Management Information would "Induce, Enable, Facilitate, or Conceal" Infringement</u>*

Even if, *arguendo*, Haid recognized that the watermark was going to be removed for the Reel, Haid is not liable for this claim unless she knew that the removal would "induce, enable, facilitate, or conceal" her ability to commit copyright infringement.

Haid had no intent of infringing on Bain's copyright.  All she cared about was using the footage to create an acting reel because Bain promised years ago that Haid could do so.  Within days of receiving the cease and desist from Bain's attorney, Haid complied with the demand and responded by saying "Here you have in writing that I Jessica do not posses [sic] any copies of Nowhereland."  Clearly, Haid's intent was not set on committing copyright infringement.

*iii.  <u>Haid's Hiring of LA Media to Create the Reel Does not Infringe on Bain's Rights Because Her Actions Pertaining to the Reel are Protected by Fair Use</u>*

As discussed above, Haid's hiring of LA Media to create the Reel does not infringe on Bain's copyright to the Film because the commissioning and creation of the Reel amounts to fair use.  The Film's purpose is to tell a fictional story.  The

**DEFENDANT / COUNTER-CLAIMANT JESSICA HAID'S MOTION FOR SUMMARY JUDGMENT AND/OR ADJUDICATION**

-17-

PIERCE LAW GROUP LLP
9100 Wilshire Boulevard
Suite 225 East Tower
Beverly Hills, California 90212

Reel's purpose is to factually show in a visual manner Haid's acting prowess for resume purposes.  Haid's use of the footage is transformative in purpose, only uses the amount that is necessary to display her level of proficiency as an actress, and the use has absolutely no real or potential economic harm on the Film's market.  If the Court finds that the use itself is fair, then the ruling will be diametrically opposed to a finding that Haid was "induc[ing], enabl[ing], facilitat[ing], or conceal[ing]" infringement because fair use cannot *simultaneously* be an infringing use.  17 U.S.C. § 107 ("fair use of a copyrighted work . . . is not an infringement of copyright.").

## V.    **CONCLUSION**

As shown above, Haid's conduct with regards to the Reel are protected by fair use.  Furthermore, Bain has not – and cannot – demonstrate that Haid possessed the requisite mental state under 17 U.S.C. § 1202 because Haid did not remove any of the CMI, Haid did not care whether any of the CMI was included within her Reel, and Haid's conduct cannot "induce, enable, facilitate, or conceal" infringement because the actions amount to fair use.  Bain therefore, as a matter of law, cannot prevail on her claims for copyright infringement, vicarious and/or contributory copyright infringement, or violation of 17 U.S.C. § 1202.

Respectfully submitted.

Dated: July 13, 2020            **PIERCE LAW GROUP LLP**

By: */s/ David Albert Pierce*
         David Albert Pierce, Esq.
         John R. Baldivia, Esq.
         Attorneys for Defendant / Counter-
         Claimant JESSICA CESARO,
         professionally known as JESSICA
         HAID

PIERCE LAW GROUP LLP

9100 Wilshire Boulevard
Suite 225 East Tower
Beverly Hills, California 90212

---

**DEFENDANT / COUNTER-CLAIMANT JESSICA HAID'S MOTION FOR SUMMARY
JUDGMENT AND/OR ADJUDICATION**