David Albert Pierce, Esq. SBN 162396
david@piercellp.com
John R. Baldivia, Esq. SBN 313699
john@piercellp.com
**PIERCE LAW GROUP LLP**
9100 Wilshire Boulevard
Suite 225 East Tower
Beverly Hills, California 90212-3415
Telephone (310) 274-9191
Facsimile (310) 274-9151

Attorneys for Defendant and Counter-Claimant JESSICA CESARO, professionally known as "JESSICA HAID"

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBIN BAIN, an Individual, <br><br> Plaintiff, <br><br> v. <br><br> FILM INDEPENDENT, INC., a California Corporation, doing business as the "LA Film Festival"; LA MEDIA WORKS, CORP. a business entity of unknown form; JESSICA HAID a.k.a. "Jessica Cesaro", an Individual; and DOES 1-10, <br><br> Defendants. | Case No.: 2:18-cv-04126-PA(JEMx) <br><br> **DEFENDANT / COUNTER CLAIMANT JESSICA HAID'S REPLY IN SUPPORT OF JESSICA HA'D'S MOTION FOR SUMMARY JUDGMENT AND/OR ADJUDICATION** <br><br> [*Declaration of Jessica Haid, Declaration of John R. Baldivia, and Statement of Uncontroverted Facts and Conclusions of Law, and Reply to Plaintiff's Statement of Disputed Facts filed concurrently herewith*] |
| JESSICA TAYLOR CESARO professionally known as "JESSICA HAID," an Individual, <br><br> Counter-Claimant, <br><br> v. <br><br> ROBIN BAIN, an Individual; and DOES 11-20, | DATE:            August 10, 2020 <br> TIME:            1:30 p.m. <br> JUDGE:           Percy Anderson <br> COURTROOM: 9A <br><br> COMPLAINT FILED: <br>         May 16, 2018 <br> FINAL PRETRIAL CONFERENCE: <br>         October 8, 2020 <br> TRIAL DATE: <br>         October 13, 2020 |

**DEFENDANT / COUNTER CLAIMANT JESSICA HAID'S REPY IN SUPPORT OF JESSICA HAID'S MOTION FOR SUMMARY JUDGMENT AND/OR ADJUDICATION**

Counterclaim-Defendants.

# TABLE OF CONTENTS

I. **ARGUMENT** ...................................................................................... 1

    a. **All of Haid's Allegedly Infringing Conduct was For a Purpose that is Transformative in Use**.................................................................. 1

    b. **Bain's Grossly Exaggerated Arguments Do Not Tip the Scales Against a Finding of Fair Use** ............................................................ 3

        i. *Purpose and Character of the Use* ................................................ 3

        ii. *Nature of the Original Work* ........................................................ 5

        iii. *Amount and Substantiality of the Portion Used* .......................... 6

        iv. *Effect on the Potential Market* ..................................................... 9

    c. **Bain Still Has Not Produced Any Evidence That Haid Had Knowledge or Reasonable Grounds to Know that Distribution of the Reel "Will Induce, Enable, Facilitate, or Conceal" Copyright Infringement** ...................................................................................... 10

II. **CONCLUSION**.................................................................................. 11

**PIERCE LAW GROUP LLP**
9100 Wilshire Boulevard
Suite 225 East Tower
Beverly Hills, California 90212

**DEFENDANT / COUNTER CLAIMANT JESSICA HAID'S REPY IN SUPPORT OF JESSICA HAID'S MOTION FOR SUMMARY JUDGMENT AND/OR ADJUDICATION**
-ii-

# TABLE OF AUTHORITIES

**Cases**

*Campbell v. Acuff–Rose Music, Inc.*,
   510 U.S. 569 (1994) ............................................................................... 4, 6

*Jartech, Inc. v. Clancy*,
   666 F.2d 403 (9th Cir. 1982) ......................................................................6

*Kelly v. Arriba Soft Corp.*,
   336 F.3d 811 (9th Cir. 2003) ......................................................................7

*Seltzer v. Green Day, Inc.*,
   725 F.3d 1170 (9th Cir. 2013) ....................................................................7

*Stevens v. Corelogic, Inc.*,
   899 F.3d 666 (9th Cir. 2018), cert. denied, 139 S. Ct. 1222 (2019) ............11

**Statutes**

17 U.S.C. § 101 .................................................................................................5

17 U.S.C. § 1202 ........................................................................................10, 11

PIERCE LAW GROUP LLP
9100 Wilshire Boulevard
Suite 225 East Tower
Beverly Hills, California 90212

# MEMORANDUM OF POINTS AND AUTHORITIES

Jessica Cesaro, professionally known as Jessica Haid ("Haid"), hereby submits this Reply in support of her Motion for Summary Judgment ("MSJ") [Dkt. 115-1].

## I. ARGUMENT

### a. All of Haid's Allegedly Infringing Conduct was For a Purpose that is Transformative in Use

Haid's allegedly infringing acts are protected by fair use because the acts were performed for a transformative purpose. Haid never had any intention to distribute the Film or her Reel to the general public with the purpose of capitalizing on the Film's market for her own financial gain.

Haid's only purpose for sharing the Film with LA Media was so that LA Media could create the Reel. Statement of Uncontroverted Facts in Support of Reply ("SUF") ¶ 119. Furthermore, Haid's only purpose for having LA Media create the Reel was so that she can demonstrate the range of her acting abilities to potential casting directors. *Id*. Haid did not have possession of any acting reel that was prepared by Robin Bain. *Id*. ¶ 120. Although Haid provided LA Media with other sources of content to create the Reel, it was LA Media's decision not to use any source other than the Film. *Id*. ¶ 121. Haid never shared a copy of the Film or the Reel with anyone else besides LA Media. *Id*. ¶ 122. The only reason that Haid's family friend, Amy Oosterhouse ("Oosterhouse"), may have commented on the Reel to LA Media is because Haid may have shown Oosterhouse the Reel in person. *Id*. ¶ 123. Haid never sent Oosterhouse a copy of the Reel. *Id*. Oosterhouse was never told that Haid direct, produced, or created the Film. *Id*. ¶ 124. Oosterhouse was aware of Haid's role in the Film, and referred Haid to LA Media so that Haid could hire them to create an acting reel. *Id*. ¶ 125.

Bain argues that Haid downloaded a copy of the Reel on February 28, 2017

and maintained a copy in her possession even after Peter Shimamoto delivered a cease and desist letter to Haid. This argument is constructed upon information that has been grossly misconstrued by Bain's counsel, Justin Gomes. Haid's counsel previously informed Mr. Gomes that Haid complied with Peter Shimamoto's cease and desist letter in good faith so that she would "not get sued" by Bain. *Id*. ¶ 126. While Mr. Gomes recalls this conversation in an attempt to burden the Court with specious allegations of spoliation, Mr. Gomes omits that, in the same conversation, Haid's counsel informed Mr. Gomes that LA Media's counsel produced a copy of the Reel to Haid's counsel after this lawsuit commenced. *Id*. ¶ 127. LA Media made a DVD copy of the Reel that was made available to Haid in February 2017, and delivered the DVD copy to Haid's counsel on November 19, 2018. *Id*. ¶ 128. Thus it is no surprise that the "Media Create Date" would say "2017:02:28" *Id.*

Furthermore, whether or not Haid inadvertently held a copy of the digital video file of the Film in her Google Drive is of no consequence because it was never shared with anyone besides LA Media. *Id*. ¶ 129. Unfortunately for Haid, her technological ineptitude has come to haunt her. Having forgotten she had forgotten to look in her Google Drive, Haid had no idea that a copy remained in her Google Drive until Bain raised it on Opposition. *Id*. ¶ 130.

Bain also claims that Haid manipulated the "owner" information of the Film to identify herself as the owner. However, Bain's argument simply misconstrues Google Drive's mechanics. The "owner" information, as used in this sense, only proves that a digital copy of the video file was created in Haid's Google Drive. Haid does not know how to manipulate the metadata of a digital video. *Id*. ¶ 131. Furthermore, Haid had no knowledge that receiving a copy of the Film in her Google Drive would alter the metadata or copyright management information ("CMI") of the digital video file. *Id.*  According to Bain, this digital file still contains the CMI that reads "Property of LesLin Films 2016." Bain's Opposition

to MSJ ("Opposition"), Ex. 12. Thus, when Haid shared the digital file with LA Media, LA Media clearly saw the CMI, and through its own standard procedure, removed the CMI from the digital video file without any instruction from Haid. SUF ¶ 132.

### b. Bain's Grossly Exaggerated Arguments Do Not Tip the Scales Against a Finding of Fair Use

Despite Bain's widely exaggerated arguments in Opposition to Haid's MSJ, the facts heavily weigh in favor of a finding of fair use. Bain's argument is largely premised on the wild idea that the Reel (which uses at *best* a total of 4% of the Film's footage and dialogue), which is intended for casting directors viewing only, serves as a substitute for the Film itself, and has the potential to affect the market for the Film with disastrous results.

As discussed in the MSJ, the Reel is intended solely for informational purposes as to Haid's acting ability, which is contrary to the Film's purpose of entertaining and telling the story of the Film. The Reel only takes the amount necessary to demonstrate the range of Haid's acting prowess. Importantly, the Reel had absolutely no impact on the Film's ability to gain critical acclaims, obtain distribution, or garner widespread reception from the general market.

#### i. *Purpose and Character of the Use*

Bain argues that an "accused work is not transformative if an audience can use that accused work in the same way it would use the original." To say that the Reel can serve as a substitute for the Film is an incredible stretch. Bain would be hard-pressed to find a reasonable person who can attest that watching the Reel is the functional equivalent of watching the Film. As discussed in the MSJ, the scenes from the Film are depicted out of context and out of order in the Reel. Because of

PIERCE LAW GROUP LLP
9100 Wilshire Boulevard
Suite 225 East Tower
Beverly Hills, California 90212

this, the Reel fails to effectively tell the story of the Film at all.

Bain misses the point entirely by arguing that the allegedly infringing scenes in the Reel "illicit the same emotional response in the audience as the Film's use of the same." The very informational purpose of the Reel is to demonstrate that Haid is capable of conveying emotion through her acting. Even Bain herself provides evidence that the very purpose of an acting reel is to "convince a casting director to call an actor to audition for a role" [Opposition, Ex. 18, Dkt. 124-19] and the "demo reel is quickly becoming the most important part of professional casting" [Opposition, Ex. 17, Dkt. 124-18]. Of course Haid's performance in the Reel will convey the same emotional response as in the Film – that is the very informative purpose that the Reel is intended for. The difference is that the Reel does not provide any context to the story, and therefore cannot convey the story of the Film.

Bain further argues that the Reel is not transformative because it does not comment on the Film. Again, this is missing the point of the Reel. The Reel is a visual display of Haid's acting ability within the Film, used for the purpose of convincing casting directors to grant Haid an audition in a future role. The Reel, by its very nature, is a commentary of Haid's acting performance within the Film.

Finally, Bain further argues that the Reel is not transformative because the Reel is commercial in nature. Courts have not precluded a finding of transformative use simply because a secondary work was created for commercial purposes. *See Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569 (1994) (commercial parody of Roy Orbson's song "Pretty Woman" was fair use). Nevertheless, the Reel is *not* commercial in the same sense that the Film is commercial. The Reel is evidence of Haid's talent, and is "even more important than headshots and resumes" when securing auditions [Opposition, Ex. 17, Dkt. 124-18]. The "advertisement" purpose of the Reel promotes Haid's acting ability, not a competing motion picture. Haid does not sell her Reel in order to steal revenue from the Film's audience on Amazon

PIERCE LAW GROUP LLP
9100 Wilshire Boulevard
Suite 225 East Tower
Beverly Hills, California 90212

DEFENDANT / COUNTER CLAIMANT JESSICA HAID'S REPY IN SUPPORT OF JESSICA HAID'S MOTION FOR SUMMARY JUDGMENT AND/OR ADJUDICATION
-4-

Prime or other streaming video on-demand service. SUF ¶ 135.

### ii. *Nature of the Original Work*

Again, the nature of the Reel is informative of Haid's acting abilities. Bain argues scope of fair use is narrower in this case since the Film is allegedly "unpublished." However, the Film was *not* unpublished. As previously stated, the Film was publicly exhibited in theaters on the following dates:

- May 26, 2016 at the IFS Film Festival in Los Angeles, California;
- October 21, 2016 at the LA Femme Film Festival in Beverly Hills, California;
- October 25, 2016 at the Twin Cities Film Festival in Minneapolis, Minnesota;
- November 6, 2016 at the ARPA International Film Festival in Hollywood, California;
- November 23, 2016 at the Newfilmmakers New York in New York City, New York.

SUF ¶ 136.

Title 17 U.S.C. § 101 defines "Publication" as "the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending." In 2016 alone, tickets to see the Film in theaters were being sold to the general public in Los Angeles, and possibly other cities. SUF ¶ 137. By the time LA Media created the Reel, the Film had already been receiving critical acclaim at numerous film festivals. Declaration of Robin Bain in Support of Opposition ("Bain Decl.") ¶ 11. This is therefore not a case where Bain had lost her opportunity to transact the "first sale" of her Film.

Although Bain further argues that Haid was required to "keep confidential all written, creative, technical and financial details" of the Film, no case has ever

decided that a finding of fair use requires obtaining consent from the original author. Haid did not "publish" the Film or the Reel on the internet. The Film was not viewable on the internet without access to the private url link to Haid's Google Drive. Furthermore, the Reel was not "published" on LA Media's website for public consumption. The only reason the Reel was searchable online was due to inadvertent disclosure by LA Media. Thus, this argument does not support a finding against fair use.

### iii.  *Amount and Substantiality of the Portion Used*

By take a closer look at the quantity of footage that Bain claims are "substantial portions" of the Film, one can grasp how *unsubstantial* the secondary use of the Reel actually is. For the sake of argument, the comparison below pertains to the longer version of the Reel, which Bain frequently cites to in her Opposition.

When comparing the length of the Reel versus the length of the Film, the amount at issue in this case is trivial in nature. The longer version of the Reel is 3 minutes and 39 seconds in length. SUF ¶ 139. Compared to the 95-minute Film, the Reel consists of only 3.8% of the Film's footage. *Id.* Over 90% of the footage in the Reel depicts Haid's image on screen. *Id.*

Any casual viewer of the Film will recognize that Haid appears in much less than 90% of the footage of the Film. *Id.* Fair use has certainly been found in cases where a secondary work uses comparatively *more* that this Reel uses of the Film. *See Campbell*, 510 U.S. 569 (creating a commercial parody of the Roy Orbson's song "Pretty Woman" was fair use); *Jartech, Inc. v. Clancy*, 666 F.2d 403 (9th Cir. 1982) (taking photographs of screen images for an entire film and tape recording the audio in order to gather evidence of an ordinance violation was considered fair); *Kelly v. Arriba Soft Corp.*, 336 F.3d 811 (9th Cir. 2003) (transforming full photographs into thumbnail images for a website was fair use); *Seltzer v. Green*

PIERCE LAW GROUP LLP
9100 Wilshire Boulevard
Suite 225 East Tower
Beverly Hills, California 90212

*Day, Inc.*, 725 F.3d 1170, 1178 (9th Cir. 2013) (Green Day's use of the entire *Scream Icon* image as a concert display was fair use).

Bain tries to argue that the use of "40 different scenes" constitutes a substantial use of the Film. However, describing each of these as "scenes" is misleading considering that almost all of the "scenes" are less than 10 seconds in length (for clarity we will describe each "scene" in the Reel as clips). Because of the brevity of these clips, and the limited use of any dialogue from the Film, one can hardly grasp the context of the scene when viewing the Reel because most of the scene and dialogue has cropped out for the Reel. Below is a summary of the clip usage within the Reel:

- 25 of the 40 clips are visuals of Haid's acting without any dialogue;
- 26 clips are less than 3 seconds in length;
- 5 clips are between 3 and 5 seconds in length;
- 7 clips are between 5 and 10 seconds in length;
- 2 clips are over 10 seconds in length.

SUF ¶ 140.

Of the clips that are over 10 seconds in length, one clip is 18 seconds and the other is 1 minute and 9 seconds. SUF ¶ 141. The 18-second clip is taken from a bathroom scene in the Film that is originally 2-minutes and 14-seconds in length, starting from the timestamp 33:03 in the Film and continuing until 35:17. *Id.* This clip contains 6 words from Cap, none of the dialogue from Jamie or Kim, and omits 1 minute and 56 seconds of the original bathroom scene. *Id.*

Meanwhile, the 1-minute and 9-second clip is taken from a "motel scene" which Bain claims to be the "most critical interaction between the Film's two main characters." *See* Opposition p. 12. This original motel scene is approximately 2-minutes and 37-seconds in length, starting from the timestamp 42:49 in the Film and continuing until 45:26. SUF ¶ 142. The clip concentrates primarily on Shara's

PIERCE LAW GROUP LLP
9100 Wilshire Boulevard
Suite 225 East Tower
Beverly Hills, California 90212

emotional performance opposite Jamie, while only including portions of Jamie's dialogue to provide context to what Shara is saying. *Id.* Although this clip appears to be one continues scene, in actuality the clip consists of three separate segments from the motel scene merged into one (i. 42:49 to 43:23, ii. 43:50 to 44:08, and iii. 44:47 to 45:26). *Id.* The portions that were omitted from the Reel consist mainly of Jamie's dialogue from the motel scene. SUF ¶ 143. Thus, even in this "critical interaction" between Shara and Jamie, the Reel focuses Shara's emotional performance and eliminates much of Jamie's "interaction."

Finally, when comparing the quantity of the dialogue in the Reel versus the quantity of dialogue in the Film's final script dated October 2014 [*See* Haid's MSJ, Ex. 3, Dkt. 116-1, pp. 9-113] ("Script"), one gets an even greater sense that the Reel contains too little of the Film's content to warrant a finding of infringement. Below is a table consisting of the Film's prominent characters, comparing the amount of lines from that character in the Reel versus the amount of lines for that same character in the Script.

| Character Name | Audible Lines in the Reel | Visible Lines in the Script[1] |
|---|---|---|
| Shara | 17 | 229 |
| Jamie | 6 | 168 |
| Kim | 2 | 81 |
| Bridgette | 1 | 52 |
| Cap | 1 | 34 |
| Louie | 1 | 33 |
| Madame Yeva | 0 | 28 |
| Alin | 0 | 19 |

---

[1] These totals were calculated by counting the number of times that a character's name was depicted in ALL CAPS in the Script, which is approximately the amount of times that a character has a speaking line in the Film. SUF ¶ 144. The amount of speaking lines in the Film may vary slightly as the Film may have been edited in a manner that is not 100% true to the Script. *Id.*

PIERCE LAW GROUP LLP
9100 Wilshire Boulevard
Suite 225 East Tower
Beverly Hills, California 90212

| Sero | 0 | 16 |
|---|---|---|
| Tom | 0 | 11 |
| Hank | 0 | 8 |
| Will | 0 | 8 |
| Stosh | 0 | 5 |
| Motel Manager | 2 | 4 |
| Kristi | 0 | 3 |
| Lisa | 0 | 3 |

Comparing the quantity of dialogue in the Reel versus the quantity of dialogue in the Script, the Reel contains approximately 4.2% of the total dialogue from the characters above, with the majority coming from Haid's character, Shara. SUF ¶ 145. This demonstrates that the Reel contains only the amount that is necessary to display Haid's acting ability.

Bain further argues that she created an acting reel for Haid, and thus there was no need for Haid to commission the creation of the Reel. However, Haid does not have a copy of this acting reel, and the acting reel created by Bain did not convey Haid's ability to act. SUF ¶ 146. Bain also claims that a reel must be no more than 2 minutes in length. This is hardly an industry requirement as the appropriate length of a reel is subject to differing opinions. *See e.g.* Donaldson Report, p. 8 (the length of an acting reel "ranges anywhere from one or two minutes to three or four minutes").

### iv. *Effect on the Potential Market*

As discussed in the MSJ, Haid's Reel had no market effect on the Film whatsoever. Bain argues that unrestricted and widespread publication of previously unreleased footage in the Reel has the potential to decimate the value of a film. However, the Reel is not intended for consumption by the general public – it is meant solely for prospective employers and is provided to them for free. Haid never intended to make the Reel subject to unrestricted and widespread publication. Haid

never made her Google Drive link available to anyone other than LA Media.

Furthermore, Bain still has not provided evidence of any actual damages. The Film was already exhibited to the public by the time the Reel was created. SUF ¶ 148. The creation of the Reel did not affect Bain's ability to obtain a distribution deal whatsoever, and once the Film was released on commercial platforms in May 2018, it became the "#1 Trending Movie on AMAZON PRIME," "#1 Most Popular Movie on TubiTV.com," and "Top 5 Trending Movie on Apple TV" by June. SUF ¶ 149. Bain even testified in her deposition that she does not possess any evidence of actual damages to the Film. SUF ¶ 150. Bain argues that the likelihood of market harm may be presumed when an intended use is for commercial gain. There is no direct commercial gain, or even a promise of commercial gain, for Haid regarding her use of the Reel. The Reel is simply a tool to convince casting directors to grant Haid auditions for future roles. Bain may argue that this factor does not favor either party if the market harm in play is "hypothetical," but there is nothing hypothetical about the fact that the Film suffered no damages from Haid's actions.

    c. **Bain Still Has Not Produced Any Evidence That Haid Had Knowledge or Reasonable Grounds to Know that Distribution of the Reel "Will Induce, Enable, Facilitate, or Conceal" Copyright Infringement.**

Bain still does not have evidence that Haid had knowledge or reasonable grounds to know that distribution of the Reel "will induce, enable, facilitate, or conceal" copyright infringement.

Haid did not violate § 1202 when allegedly sharing the Film with LA Media because the CMI was still present. *See* Opposition, Ex. 12. Bain blatantly misconstrues Google Drive's computer mechanics as functioning in the same manner and purpose as CMI. The "owner" information, in the context of Google Drive, only identifies the owner of the digital file in Haid's Google Drive account.

It does not suggest that "Haid owns the Film" or that "use of the Film was subject only to Haid's approval." Haid did not alter any metadata from the digital video file, nor did she remove any CMI before providing LA Media with a copy of the Film. SUF ¶ 152. There is no proof that Haid knowingly identified herself as the owner.

Additionally, Haid did not violate § 1202 when Oosterhouse saw the Reel. Bain has no evidence that Haid ever intended to mislead Oosterhouse as to the Film's title, authorship, copyright ownership, or any other credit to the Film. Furthermore, Bain has no evidence that Haid intended to "induce, enable, facilitate, or conceal" copyright infringement by sharing the Reel with casting directors. Haid's only purpose for the Reel was to show off her acting ability. Haid has never held herself out to be a director, producer, or copyright owner of the Film. SUF ¶ 153.

Bain has the burden of presenting affirmative evidence that Haid possessed the requisite mental state to violate § 1202. *Stevens v. Corelogic, Inc.*, 899 F.3d 666, 673 (9th Cir. 2018), *cert. denied,* 139 S. Ct. 1222, 203 L. Ed. 2d 208 (2019). Bain therefore cannot prevail on a § 1202 claim by simply identifying the general *possibility* that the removal of CMI will induce, enable, facilitate, or conceal copyright infringement. *Id.* As a result, Bain's claim for violation of § 1202 fails.

## II.   CONCLUSION

For the reasons presented in Haid's Motion for Summary Judgment and/or Adjudication, and further support articulated herein, the Court should grant Haid's Motion and dismiss Bain's Complaint in its entirety.

Respectfully submitted.

Dated: July 27, 2020                                **PIERCE LAW GROUP LLP**

PIERCE LAW GROUP LLP
9100 Wilshire Boulevard
Suite 225 East Tower
Beverly Hills, California 90212

By: */s/ John R. Baldivia*
David Albert Pierce, Esq.
John R. Baldivia, Esq.
Attorneys for Defendant / Counter-Claimant JESSICA CESARO, professionally known as JESSICA HAID

---

**DEFENDANT / COUNTER CLAIMANT JESSICA HAID'S REPY IN SUPPORT OF JESSICA HAID'S MOTION FOR SUMMARY JUDGMENT AND/OR ADJUDICATION**

-12-